J-S15008-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JONATHON HAMLETTE, | |
| Appellant | No. 1790 EDA 2014 |

Appeal from the Judgment of Sentence Entered May 20, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0006120-2013

BEFORE:  BENDER, P.J.E., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY BENDER, P.J.E.:               **FILED APRIL 13, 2016**

Appellant, Jonathon Hamlette, appeals from the judgment of sentence of an aggregate term of life imprisonment without the possibility of parole, imposed after a jury convicted him of second-degree murder and related offenses.  Appellant contends that the trial court abused its discretion when it denied his Pa.R.Crim.P. 600 motion to dismiss, and when it granted the Commonwealth's motion to permit evidence of Appellant's prior bad acts under Pa.R.E. 404(b).  After careful review, we vacate Appellant's judgment of sentence and remand for a new trial.

The trial court summarized the evidence presented at Appellant's trial, as follows:

---

[*] Retired Senior Judge assigned to the Superior Court.

The evidence adduced at trial established that on January 24, 2010, the decedent, William Worthy, was stabbed twice, once in the heart, at the entrance to his residence, 2813 North Bambrey Street, at roughly 8:30[]am.

In the early hours of January 24, 2010, Sharma Sanford was near the corner of 25th Street and Lehigh Avenue in search of drugs, namely crack-cocaine. There, [Appellant] approached Ms. Sanford asked her if she "was looking to get high." The two proceeded to 2813 North Bambrey Street to purchase crack-cocaine. [Appellant] asked Ms. Sanford to purchase the drugs from William Worthy because, as told to Ms. Sanford, there had previously been an incident between [Appellant] and the decedent. Ms. Sanford was the only one to enter the residence, and she purchased the drugs from the decedent; [Appellant] and Ms. Sanford proceeded to a residence on Oakdale Street. [Appellant] told Ms. Sanford that the Oakdale Street residence was his home and, once they entered, they proceeded to walk through the living room toward the basement. In the basement, Ms. Sanford saw a single bed. Both proceeded to smoke the drugs which they had recently purchased. Ms. Sanford testified that she became uncomfortable and wanted to leave after smoking the drugs. Along with being in an unfamiliar place with a person whom she had just met, Ms. Sanford testified that her uneasiness was also rooted in the weapon, a knife, which [Appellant] had on a shelf near him. Upon leaving, Ms. Sanford saw [Appellant] take the knife from the shelf and place it in his back pocket. [Appellant] and Ms. Sanford left the Oakdale Street residence, headed to another residence on Bonsall Street, and then back to the decedent's residence at 2813 North Bambrey Street to smoke more drugs.

When the two arrived, Ms. Sanford was once again the only one to enter the residence to purchase additional drugs. Mr. Worthy let Ms. Sanford in, took her to the second floor, and sold her the drugs. After Ms. Sanford purchased the singular bag which she and [Appellant] were going to share, Ms. Sanford removed a portion of the drugs from the baggie for herself. Within the residence were three people, William Worthy and two ladies, one of whom was asleep in another room. Shortly thereafter, there was a knock at the door and Ms. Sanford told Mr. Worthy that the person at the door was probably Johnny[2] and that he should let him in. Mr. Worthy went to the door and let [Appellant] in, and both men went to the second floor. When

[Appellant] was upstairs, Ms. Sanford gave [Appellant] the drugs.

_____

[2] When they first met, [Appellant] told Ms. Sanford that his name was Johnny.

_____

Ms. Sanford testified that [Appellant] remarked to Mr. Worthy that the amount of drugs in the bag was light and then asked Mr. Worthy if he would give [Appellant] more drugs. Mr. Worthy declined and, after the group smoked what they had in the second-floor room, [Appellant] asked to speak to Mr. Worthy privately downstairs. After a few minutes, Ms. Sanford heard tussling and went to the top of the stairs. Ms. Sanford testified that she saw Mr. Worthy struggling with someone, but she could not tell who the other person was. Ms. Sanford ran back into the second-floor room to grab the other two ladies. While she was in the second-floor room, Ms. Sanford heard Mr. Worthy yell out, "He stabbed me. He got me for three bags."[3] Ms. Sanford left the second-floor room and went downstairs to aid Mr. Worthy up the stairs. As Mr. Worthy was walking upstairs, he started removing his shirt. Once upstairs, Ms. Sanford saw a wound in Mr. Worthy's chest which was "gushing out" blood. Ms. Sanford was questioned about both the statement she later gave to homicide detectives and her testimony at the preliminary hearing. On both occasions, Ms. Sanford said that the person tussling with Mr. Worthy was [Appellant]. According to Ms. Sanford, those two statements were wrong because she just assumed that it was [Appellant] tussling with Mr. Worthy because he was the last person speaking to Mr. Worthy at the door before Mr. Worthy was stabbed.[4]

_____

[3] Jay Cunningham also testified. She was the [] third female at the residence. She testified that she heard Mr. Worthy scream out twice, "He stabbed me." However, Ms. Cunningham failed to identify [Appellant] at a lineup and in court as the male who was at 2813 North Bambrey Street.

[4] Dr. Edwin Lieberman testified as an expert in forensic pathology. Dr. Lieberman testified that the decedent, William Worthy, died of a stab wound to the chest.

- 3 -

_____

Davina Phillips, the lady who had previously been asleep in another room in the house, placed a call to 911. Officer Joseph Stallbaum was the first officer to respond to the scene. Officer Stallbaum approached the residence and saw Ms. Sanford and Ms. Phillips standing near the entrance to the residence. Mr. Stallbaum went to the second-floor room to survey Mr. Worthy's condition. Once medical support arrived, Mr. Stallbaum went downstairs to speak to both ladies. Ms. Sanford detailed to Officer Stallbaum [Appellant's] clothing, name, and physical features. She also told him the address to which [Appellant] had probably fled; Officer Stallbaum then relayed this flash information to police dispatch and to the next officer arriving on the scene, Officer Eric Cohn. Officer Cohn went to the 2500 block of West Oakdale Street to find [Appellant]. In the meantime, Officer Stallbaum secured the scene and waited for Officer Cohn to relay any results regarding his search for [Appellant]. After Officer Cohn surveyed the 2500 block of West Oakdale Street and did not find a person matching the description of [Appellant], Officer Cohn came back to 2813 North Bambrey Street to escort Ms. Sanford and Ms. Phillips to the Homicide Division.

On the way to Homicide, Ms. Sanford told Officer Cohn that the suspect, whom she called Johnny, also was known to hang out at a property located at 2744 North Bonsall Street and that [Appellant] worked at a barbershop, called Ernie's Upper Cuts, which is located at 25th Street and Lehigh Avenue. The property on Bonsall Street is located just a few blocks from the crime scene. Officer Cohn drove past the suspect's place of employment, a barbershop at 25th Street and Lehigh Avenue, and the 2744 North Bonsall Street property. Ms. Sanford did not see [Appellant] during this canvass. As a result, Officer Cohn took both ladies to Homicide.

Officer Ryan Clement testified that he was patrolling on the morning in question in an adjoining district. With the flash information previously provided at the outset of his shift, Officer Clement noticed [Appellant] at a gas station located at the corner of Broad and Thompson Streets. Officer Clement rolled down his vehicle window and asked [Appellant] where he was coming from; [Appellant] responded that he was previously at his brother's house, located at 24th and Oakdale Streets. Based on this response, Officer Clement exited his vehicle and asked

- 4 -

[Appellant] if he had any identification; [Appellant] responded that he did not but stated to Officer Clement that his name was John, Johnny or Jonathon. Officer Clement called into his district dispatch to have someone contact the homicide detectives from the 39th district to determine whether the witness was available for a show-up.

Officer Cohn and Detective Nordo transported Ms. Sanford to the 1700 block of 17th Street to see if she could identify [Appellant] as the perpetrator. Ms. Sanford identified [Appellant] as the actor in the robbery-stabbing.

…

Officer Edward Fidler of the Crime Scene Unit testified regarding the evidence recovered at the crime scene. … Officer Fidler found blood both inside and outside 2813 North Bambrey street. Inside the property were droplets of blood spanning the distance from the area near the first floor door up to the second floor room. The blood found outside was located on the sidewalk up the block near the corner. Officer Fidler testified that the blood outside the residence appeared to be aspirated blood, meaning blood which had been spit up by someone on the sidewalk. According to Officer Fidler, the blood outside the residence contained saliva and air bubbles and was shaped in a manner to suggest that the blood had been projected, rather than dripped, to the ground. All the blood samples were collected, placed on a property receipt and sent to the Forensic Laboratory for testing.

Lynn Haimowitz testified as an expert in DNA analysis and forensic science. Ms. Haimowitz detailed the results of the report which analyzed three blood samples from within 2813 North Bambrey Street and two samples outside - the first on the porch and the second on the sidewalk in front of 2805 North Bambrey Street. Comparing the DNA profiles developed from the blood against two buccal swabs from the decedent and [Appellant], two of the three samples within the residence were determined, to a reasonable degree of scientific certainty, to be that of the decedent. The third sample found inside 2813 North Bambrey Street resulted in no DNA. As for the two samples found outside the residence, both samples produced a partial DNA profile from the same unknown male, the person being neither the decedent nor [Appellant].

- 5 -

Trial Court Opinion (TCO), 12/30/14, at 3-8 (citations to the record omitted).

Based on this evidence, the jury convicted Appellant of second-degree murder and possessing an instrument of crime (PIC). Appellant was acquitted of first-degree murder. On May 20, 2014, the court sentenced Appellant to an aggregate term of life imprisonment, without the possibility of parole. Appellant filed a timely notice of appeal, and also complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court subsequently filed a detailed Rule 1925(a) opinion. Herein, Appellant presents two issues for our review:

> [(1)] Did the [trial] court commit[] an abuse of discretion by denying Appellant's Rule 600 motion to dismiss?
>
> [(2)] Did the [trial] court commit an abuse of discretion by granting the Commonwealth's [Rule] 404(b) motion?

Appellant's Brief at 3 (unnecessary capitalization omitted).

Appellant first challenges the court's denial of his pretrial, Rule 600 motion to dismiss the charges against him. Our scope and standard of review for such claims is well-settled:

> In evaluating Rule 600 issues, our standard of review of a trial court's decision is whether the trial court abused its discretion. Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.
>
> The proper scope of review ... is limited to the evidence on the record of the Rule 600 evidentiary hearing, and the findings of

the trial court. An appellate court must view the facts in the light most favorable to the prevailing party.

Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule 600. Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society.

…

So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule 600 must be construed in a manner consistent with society's right to punish and deter crime. In considering these matters ..., courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

*Commonwealth v. Ramos*, 936 A.2d 1097, 1100 (Pa. Super. 2007) (*en banc*) (quoting *Commonwealth v. Hunt*, 858 A.2d 1234, 1238 (Pa. Super. 2004) (*en banc*)).

Rule 600(A)(2)(a) requires that trial commence within 365 days of the filing of the written complaint.[1]

> The mechanical run date is the date by which the trial must commence under [Rule 600]. It is calculated by adding 365 days (the time for commencing trial under [Rule 600]) to the date on which the criminal complaint is filed. As discussed herein, the mechanical run date can be modified or extended by adding to the date any periods of time in which delay is caused by the defendant. Once the mechanical run date is modified accordingly, it then becomes an adjusted run date.

_____

[1] Rule 600 was revised in 2012, and the current version of the rule became effective on July 1, 2013, prior to Appellant's filing of his pretrial motion to dismiss.

> If the defendant's trial commences prior to the adjusted run date, we need go no further.

**Ramos**, 936 A.2d at 1102 (internal citation and footnote omitted).

Here, the Commonwealth filed two written criminal complaints against Appellant; the first was filed on January 24, 2010, and withdrawn on November 10, 2010. A second criminal complaint was filed on May 17, 2013. Appellant contends that the trial court abused its discretion by calculating the mechanical run date from the date on which the Commonwealth filed the second criminal complaint, rather than from the date on which the first complaint was filed.

> [W]hen a trial court is faced with multiple identical criminal complaints, it must first determine whether the Commonwealth intended to evade Rule 600's timeliness requirements by withdrawing or having *nolle prossed* the charges. If the prosecution attempted to circumvent Rule 600, then the mechanical run date starts from the filing of the initial complaint, and the time between the dismissal of one complaint and the re-filing of the second complaint is counted against the Commonwealth. However, where the prosecution has not attempted to end run around the rule, and a competent authority properly dismissed the case, the court must next decide if the Commonwealth was duly diligent in its prosecution of the matter. Where the prosecution was diligent, the inquiry ends and the appropriate run date for purposes of Rule 600 begins when the Commonwealth files the subsequent complaint.

**Commonwealth v. Peterson**, 19 A.3d 1131, 1141 (Pa. Super. 2011) (*en banc*).

Appellant does not argue that the Commonwealth withdrew the initial complaint in an attempt to evade Rule 600. Instead, he contends that the Commonwealth did not act with due diligence in prosecuting that complaint

and, thus, the mechanical run date must commence from the filing of the first complaint. After careful review, we disagree.

The trial court set forth the pertinent procedural history underlying Appellant's Rule 600 claim, as follows:

> [T]he criminal complaint was filed the day of the murder, January 24th, 2010; after several continuances, the listing for November 10, 2010 was listed as "must be tried, no further continuances"; the Commonwealth withdrew the complaint on November 10, 2010; the Defendant was arrested again on April 18, 2013; and the criminal complaint in this case was refiled on May 17, 2013.
>
> Detective Donald Marano (Homicide Unit) testified at the pretrial motion hearing. Detective Marano was the lead detective handling the case…. On three separate dates - March 23, May 19 and September 15 of 2010 - the Commonwealth requested continuances in the case because the only person capable of identifying [Appellant], Ms. Sanford, failed to appear.
>
> Detective Marano testified that Ms. Sanford failed to appear for the three listed court dates. According to Detective Marano, efforts to locate Ms. Sanford were sparse between March 23, 2010 and November 5, 2010, five days before the final listing. One of the few steps attempted by the police occurred on May 19, 2010, the second listed hearing date. On May 19, 2010, two detectives, Detectives Byard and Kane, traveled to a Sellersville, Bucks County address on record for Ms. Sanford to transport her to the proceeding and to serve a subpoena. When the detectives told Ms. Sanford that they would be transporting her to the preliminary hearing, Ms. Sanford refused allegedly because of the lack of a child seat in the police car for her infant child. Detective Marano testified at this hearing regarding the statements Ms. Sanford made to both detectives during this incident. The only other activity prior to November 5, 2010 was one other trip, made by Detective Marano at some point prior to the September 15th hearing, wherein he traveled to Sellersville to locate Ms. Sanford at a rehab in the area. Detective Marano did not know if Ms. Sanford ever received a subpoena for the September 15, 2010 hearing.

Roughly a month before the November 10, 2010 hearing, Detective Marano was informed by the prior Assistant District Attorney handling this case that Ms. Sanford had left her two messages on her voicemail. Both voicemail messages were played for the court. In essence, the voicemail messages evidenced Ms. Sanford's intent to avoid testifying. The first voicemail message left by Ms. Sanford was not time-stamped, but it was referenced in Ms. Sanford's second voicemail. The second voicemail was time-stamped; the message was left on September 15, 2010.

Five days before the last scheduled hearing, the Honorable Benjamin Lerner signed an order declaring Mr. [*sic*] Sanford a material witness. On November 8, 2010, Detective Marano placed phone calls with four separate numbers that were listed for Ms. Sanford. Detective Marano left messages at two of the numbers, but the calls were never returned. On November 9, 2010, Detective Marano, along with Detective Kane, traveled to the Sellersville residence where the detectives had previously found Ms. Sanford. Interviews with residents and workers of the complex determined that Ms. Sanford had vacated her apartment five weeks prior. The detectives spoke with the apartment manager who informed them that Ms. Sanford was working at Doylestown Hospital, to the best of his knowledge. The detectives traveled to Doylestown Hospital; at the hospital[,] the detectives learned that Ms. Sanford had been offered employment, but failed to show up for one day of work. From there, the detectives traveled to the home belonging to Ms. Sanford's mother. The detectives also traveled to areas where Ms. Sanford was known to be when in the midst of her drug affliction.

Detective Marano prepared wanted posters and had them sent to three separate districts. Detective Marano also flagged Ms. Sanford's criminal record, attached a[] [National Crime Information Center (NCIC)] person of interest flag to the missing person report for her in another database, and placed the wanted posters on two fugitive walls in the precinct waiting area. On November 10, 2010, the detectives again went to the residence of Ms. Sanford's mother to see if Ms. Sanford had shown up. All results were negative and the case was withdrawn on November 10, 2010.

[On] or about April 9, 2013, Officer Alex Montanez noticed the wanted poster and spoke with one of the detectives from the

homicide unit; on April 12, 2013, Officer Montanez found Ms. Sanford and brought her in on the material witness warrant.

TCO at 8-11 (footnotes and citations to the record omitted).

Appellant avers that the above-stated facts show that the Commonwealth failed to take "even the most basic of steps" to locate Ms. Sanford. Appellant's Brief at 22. He discusses several "reasonable and conventional means" that the Commonwealth could have undertaken to secure Ms. Sanford's presence at the preliminary hearing, such as those done in ***Commonwealth v. Ingram***, 591 A.2d 734 (Pa. Super. 1991), and ***Commonwealth v. Laurie***, 483 A.2d 890 (Pa. Super. 1984). In ***Ingram***, we held that the Commonwealth acted with due diligence where police officers attempted to serve an arrest warrant at Ingram's last known address; talked with his mother about the possibility that Ingram had left town; entered Ingram's name into criminal databases; and had officers look for Ingram while on daily patrol in his neighborhood. ***Id.*** at 737. In ***Laurie***, we concluded that police acted diligently in attempting to locate and arrest Laurie where they immediately obtained an arrest warrant; contacted numerous members of Laurie's family; contacted utility companies when discovering Laurie may have relocated to a different state; placed an advertisement with a photograph and physical description of Laurie in local newspapers where police officers thought he may be; and placed Laurie's name in the NCIC and the Philadelphia Crime Information Center (PCIC) to "circulate throughout the country and state that [Laurie was] wanted in Pennsylvania." ***Id.*** at 891.

Appellant claims that the present case is distinguishable from *Ingram* and *Laurie*. He stresses that here, the Commonwealth did not immediately file a "material witness petition" for Ms. Sanford's arrest; it did not contact utility companies or the probation office to find Ms. Sanford; and it did not have police visit "locations where [Ms. Sanford] might be found…." Appellant's Brief at 25, 26. Appellant asserts that instead of undertaking a diligent search for Ms. Sanford, the Commonwealth relied "solely on the serendipitous chance that [Ms. Sanford] would be apprehended as a result of the addition of her name to computer [databases] and the hanging of a wanted poster." *Id.* at 26. Appellant also attacks the efforts made to locate Ms. Sanford in the years between the withdrawal of the initial complaint and the refiling of the second complaint. He argues that, "[o]ther than testimony that police visited specific addresses prior to the dismissal of the first complaint, [the] Commonwealth presented no evidence that it did so thereafter." *Id.* Appellant maintains that "at its core, the evidence presented at the Rule 600 hearing demonstrated that the Commonwealth did not exercise due diligence." *Id.*

In response, the Commonwealth first emphasizes that in *Ingram* and *Laurie*, the Commonwealth was searching for a criminal *defendant*, against whom charges had been filed. To the contrary, here, the Commonwealth was attempting to find a *witness*. As the Commonwealth explains, this distinction undercuts Appellant's argument that the Commonwealth should have immediately obtained an arrest warrant for Ms. Sanford:

> Ms. Sanford was a witness, not a criminal. She was the sole identifying witness; she did not stab the victim in the heart. That the police did not immediately obtain a material witness warrant and take her into custody at the first sign that she was reluctant to testify was eminently reasonable, and properly informed the trial court's ruling. **See** [] **Peterson**, 19 A.3d [at] 1137 … (due diligence requires the Commonwealth to "put forth reasonable effort," not "perfect vigilance and punctilious care").

Commonwealth's Brief at 18. The Commonwealth also notes that placing an advertisement in the newspaper with Ms. Sanford's photograph and/or identifying information may "have endangered Ms. Sanford, who was a witness, not an accused…." **Id.** at 24 n.4.

Additionally, the Commonwealth avers that the majority of Appellant's argument incorrectly focuses on what the Commonwealth *should have* done, rather than what it *did do*. As this Court stated in **Laurie**, "the focus of our inquiry is on what was done, not with what should have been done." **Laurie**, 483 A.2d at 892. Upon examining the efforts undertaken by the Commonwealth to locate Ms. Sanford and prosecute the initial criminal complaint against Appellant, we ascertain no abuse of discretion in the trial court's conclusion that the Commonwealth acted with due diligence. In particular, police officers went to Ms. Sanford's home before the hearing on May 19, 2010, yet Ms. Sanford refused to accompany them to court. Before the next scheduled hearing date on September 15, 2010, a detective went to a rehabilitation facility to find Ms. Sanford, but was unable to locate her. Ms. Sanford called the district attorney and left two messages on or before the September 15th hearing stating that she intended to avoid testifying.

Before the next scheduled hearing on November 10, 2010, the Commonwealth increased its efforts to locate Ms. Sanford. Namely, it obtained a material witness warrant to take Ms. Sanders into custody; called various phone numbers listed for her; visited Ms. Sanford's residence and her place of employment; interviewed residents and workers of her apartment complex, as well as the apartment manager; spoke with Ms. Sanford's mother; and traveled to areas where Ms. Sanford was known to frequent when she was using narcotics. Additionally, police flagged Ms. Sanford's criminal record, put notices in criminal databases indicating that she was a person of interest, and placed wanted posters in several precincts.

Based on these facts, the trial court did not abuse its discretion in concluding that the Commonwealth acted with due diligence in prosecuting the initial criminal complaint against Appellant. It was beyond the Commonwealth's control that Ms. Sanford was reluctant to testify and evaded the Commonwealth's attempts to locate her and secure her presence at the preliminary hearing. Because the Commonwealth exercised due diligence *before* withdrawing the initial complaint, it is irrelevant whether it acted diligently between that withdrawal and the refiling of the second complaint. **See Peterson**, 19 A.3d at 1141 ("Where the Commonwealth exercises due diligence in prosecuting the original complaint, the time period between the dismissal of the first complaint and the re-filing of the second complaint is irrelevant for purposes of Rule 600 and the Commonwealth is only required to re-file within the applicable statute of limitations.").

- 14 -

Accordingly, the trial court did not abuse its discretion by denying Appellant's Rule 600 motion to dismiss.

Appellant next argues that the trial court erred by granting the Commonwealth's pretrial motion to admit evidence of his prior bad acts under Pa.R.E. 404(b). That rule states, in pertinent part:

> **(b) Crimes, Wrongs or Other Acts.**
>
>> *(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>>
>> *(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2).

> It is well-settled that,
>
>> [o]n appeals challenging an evidentiary ruling of the trial court, our standard of review is limited. A trial court's decision will not be reversed absent a clear abuse of discretion. *Commonwealth v. Bishop*, 936 A.2d 1136, 1143 (Pa. Super. 2007) (citing *Commonwealth v. Hunzer*, 868 A.2d 498 (Pa. Super. 2005)). "Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Id.*

*Commonwealth v. Aikens*, 990 A.2d 1181, 1184-85 (Pa. Super. 2010) (quoting *Commonwealth v. King*, 959 A.2d 405, 411 (Pa. Super. 2008)).

Additionally, in regard to the admissibility of prior bad acts evidence, our Supreme Court has explained:

- 15 -

> Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa.R.E. 404(b)(2). In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact. **Commonwealth v. Powell**, 598 Pa. 224, 956 A.2d 406, 419 (2008).

**Commonwealth v. Sherwood**, 982 A.2d 483, 497 (Pa. 2009).

At the hearing on the Commonwealth's motion *in limine* to introduce prior bad acts evidence, the Commonwealth explained the two prior bad acts it sought to introduce. First, it described a knife attack by Appellant on Jacob Bowling, which occurred approximately one month before the stabbing of Mr. Worthy. The Commonwealth explained that attack, and the similarities between it and the present case, as follows:

> [The Commonwealth]: Mr. Bowling was staying at an apartment with a friend and [Appellant] and Mr. Bowling's friend had a verbal argument and Mr. Bowling intervened and basically quashed the argument.
>
> At that point, [Appellant] left. Mr. Bowling woke up and he was being stabbed about his torso with a knife by [Appellant]. He jumps up to try to get away from [Appellant] and [Appellant] stabs him in the heart. So Mr. Bowling is also stabbed in the heart. [Appellant] flees. Mr. Bowling convinces someone in the apartment to take him for help. … [H]e wakes up several days later in the hospital.
>
> So that's the 2009 stabbing, exactly one month prior to the murder in this case. Mr. Bowling's injuries are also consistent with a small knife having been used.
>
> So for [the stabbing of Mr. Bowling in] 2009 and [the stabbing of Mr. Worthy in] 2010, we have an argument. The

victim intervenes on behalf of the person [Appellant] is arguing with. [Appellant] stabs the victim in the chest with a small knife. And in both cases it's not just stabbing him in the chest, it's stabbing the victim in the heart, thereby causing either death or serious bodily injury in both of those circumstances.

N.T. Hearing, 5/6/14, at 35-37.

The second prior bad act the Commonwealth sought to introduce was a knife attack on Sonya Cabiness that occurred approximately two years after the stabbing of Mr. Worthy. The Commonwealth described that prior bad act, and its similarities to the present case, as follows:

[The Commonwealth:] With respect to the 2012 incident, the victim in that case is the then[-]girlfriend of [Appellant]. Her name is Sonya Cabiness…. [Appellant] and she have a verbal dispute. She attempts to walk away from him. He grabs her by the jacket and stabs her in the chest and then says, "That's right, bitch, I will kill you." He fled the scene and the victim called 911 and reported the crime.

In that case also, a small knife was used to stab Ms. Cabiness in the chest. She did not sustain serious bodily injury as a result of that stabbing.

*Id.* at 37.[2]

_____

[2] We note that the testimony that Mr. Bowling and Ms. Cabiness gave at trial differed from the Commonwealth's description of their attacks in several key regards. For instance, Ms. Cabiness did not testify that she was *stabbed* in the chest or heart during Appellant's assault; instead, she stated that when Appellant attacked her, he swung his arm "towards the middle of her chest slightly on the right side of her body" causing "a little slash" on her chest. N.T. Trial, 5/16/14, at 102-103. Additionally, while Mr. Bowling testified that the knife Appellant used was "[a] steak knife[,]" it was not a *small* knife as the Commonwealth asserted. *Id.* at 123. Mr. Bowling stated that it was "[o]ne of the long ones[,]" and with his hands approximated the knife to be about 18 inches long. *Id.* While we point out the differences between the Commonwealth's offer of proof at the pretrial hearing, and the testimony
*(Footnote Continued Next Page)*

The Commonwealth argued before the trial court, and reiterates on appeal, that the prior bad acts evidence involving Mr. Bowling and Ms. Cabiness was admissible to prove Appellant's *identity* as the individual who stabbed Mr. Worthy, and also to show Appellant's *intent* to kill Mr. Worthy. The trial court agreed with the Commonwealth and granted its motion to admit the testimony of Mr. Bowling and Ms. Cabiness for these purposes. **See** N.T. Trial, 5/16/14, at 97 (trial court's instructing jury that Mr. Bowling's and Ms. Cabiness' testimony was being offered for the limited purposes of showing that Appellant was "the person who stabbed William Worthy and to prove … his intent in stabbing Mr. Worthy").

Appellant first argues that the trial court abused its discretion by deciding to admit this prior bad acts evidence for the purpose of proving his identity as the person who stabbed Mr. Worthy. In **Commonwealth v. Shively**, 424 A.2d 1257 (Pa. 1981), our Supreme Court held that evidence of prior crimes may be admissible,

*(Footnote Continued)* ───────────────

actually presented at trial, Appellant did not object at trial or seek the court's reconsideration of the admissibility of the prior bad acts evidence in light of Mr. Bowling's and Ms. Cabiness' trial testimony. He also does not argue on appeal that the court should have precluded the prior bad acts evidence upon hearing the testimony of these two witnesses at trial. Instead, he frames his issue as a challenge to the court's pretrial ruling on the Commonwealth's motion *in limine*, and only discusses the prior bad acts evidence as summarized by the Commonwealth during the pretrial proceeding. Thus, we will limit our review to the record of the pretrial hearing.

to prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. Here, much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature.

*Id.* at 1259 (citation omitted). "Required, therefore, is such a high correlation in the details of the crimes that proof that a person committed one of them makes it very unlikely that anyone else committed the others."

***Commonwealth v. Weakley***, 972 A.2d 1182, 1189 (Pa. Super. 2009) (internal quotation marks and citation omitted).

In comparing the methods and circumstances of separate crimes, a court must necessarily look for similarities in a number of factors, including: (1) the manner in which the crimes were committed; (2) weapons used; (3) ostensible purpose of the crime; (4) location; and (5) type of victims. Remoteness in time between the crimes is also factored, although its probative value has been held inversely proportional to the degree of similarity between crimes.

*Id.* (internal citations omitted).

In this case, the Commonwealth argued at the pretrial hearing that the manner in which the crimes were committed was similar because all were "a close personal encounter between [Appellant] and somebody following a verbal altercation." N.T. Hearing, 5/6/14, at 38-39. The Commonwealth stressed that in all three cases, the weapon used was a knife. *Id.* at 39. In regard to location, the Commonwealth argued that

[i]n all of these cases, the incident happen[ed] either … inside … where the victim was staying or residing, or very close to the victim's residence. [Ms.] Cabiness was stabbed just outside of her home. She was attempting to get away from [Appellant]. She was stabbed on the street. Mr. Bowling and Mr. Worthy

- 19 -

were both stabbed … in the place where they were residing at the time.

*Id.* The Commonwealth also discussed the similarities between the victims in each incident, stating that they all "share something in common, which is they are people that challenged [Appellant] in some way during a verbal altercation and [Appellant] responds by use of deadly force." *Id.*

While we agree with the Commonwealth that Appellant's three offenses do have some similarities, we cannot overlook the significant differences in the stabbing attacks. First, the manner in which each attack occurred varied. For instance, in Mr. Bowling's stabbing, Appellant left after the argument, and *later* returned to stab Mr. Bowling. This is markedly different from Appellant's stabbing of Mr. Worthy and Ms. Cabiness in the *midst of* altercations with them. Additionally, Mr. Bowling was stabbed while he was sleeping, while Mr. Worthy and Ms. Cabiness were stabbed during physical scuffles with Appellant.

Further, as Appellant points out, the altercation between Appellant and Mr. Worthy began over drugs, yet there was no indication that drugs were involved in either of the other disputes. Instead, Appellant's argument with Ms. Cabiness involved a domestic issue, and Mr. Bowling was not even arguing with Appellant at all – instead, he broke up a fight between Appellant and a third-party.

We also point out that the injuries sustained by Mr. Bowling and Mr. Worthy were significantly different than the single, non-serious injury inflicted upon Ms. Cabiness. While the trial court emphasized that all three

victims were "stabbed in the chest by [a] knife[,]" Ms. Cabiness only suffered one single superficial wound, while Mr. Worthy and Mr. Bowling were stabbed at least twice and were both seriously wounded.

In regard to the location of the three attacks, the Commonwealth's argument that the stabbings are similar because they occurred in, or near, a residence of some sort is weak, at best. Ms. Cabiness was attacked on the street, Mr. Bowling was stabbed in his friend's apartment, and Mr. Worthy was stabbed in his own home. Moreover, as Appellant points out, the incidents "took place in different areas across Philadelphia." Appellant's Brief at 37. Thus, the locations of Appellant's attacks varied.

There are also notable differences in the purposes of the three attacks. The Commonwealth alleged that Appellant stabbed Mr. Worthy during the course of a drug-related robbery. *See* N.T. Trial, 5/13/14, at 139-140 (Commonwealth's stating in opening remarks that Appellant killed Mr. Worthy during a robbery). Ms. Cabiness, however, was stabbed during a domestic dispute and, apparently, Mr. Bowling was stabbed simply in retaliation for his breaking up an altercation between Appellant and another individual. Thus, Appellant's purposes for the stabbings were distinct – robbery, domestic dispute, and retaliation. Relatedly, his victims were dissimilar; Ms. Cabiness was his girlfriend, Mr. Bowling was essentially an acquaintance of Appellant, and Mr. Worthy was a drug dealer who sold Appellant crack cocaine.

Finally, the remoteness in time between Appellant's attack on Mr. Bowling and Mr. Worthy, and his assault of Ms. Cabiness, was approximately two years, which weighs in favor of excluding that prior bad act.

In sum, the three attacks have significant differences. Namely, there was a delay between Appellant's argument in the presence of Mr. Bowling and his attack on Mr. Bowling later that night. In that case, Appellant entered the apartment in which Mr. Bowling was staying, and stabbed Mr. Bowling while he was sleeping. Appellant's motive in that attack appeared to be retaliation for Mr. Bowling's involvement in Appellant's altercation with a third-party. In Mr. Worthy's attack a month later, Appellant was attempting to rob Mr. Worthy, in Mr. Worthy's own home, after a drug-sale gone wrong. Appellant argued with Mr. Worthy, the two men physically scuffled, and Appellant stabbed Mr. Worthy in the midst of the altercation. Two years later, Appellant had a domestic dispute with Ms. Cabiness on the street and inflicted a single, non-serious knife wound to her chest.

These substantial differences compel us to conclude that Appellant's attacks do not demonstrate "any particular distinctive pattern of behavior by" Appellant. **Commonwealth v. Ross**, 57 A.3d 85, 102 (Pa. Super. 2012). While to be sure, Appellant committed "crimes of the same class" by stabbing each victim in the chest, our Supreme Court made clear in **Shively** that "much more is demanded" for prior bad acts evidence to meet the identity exception of Rule 404(b). **Shively**, 424 A.2d at 1259; **see also Ross**, 57 A.3d at 102 (concluding that the commission of several physical

- 22 -

and/or sexual assaults, accompanied by the use of foreign objects, merely demonstrated, at most, "the commission of crimes or conduct 'of the same general class[,]'" and were "far from satisfying the **Shively** standard of being so "unusual and distinctive as to be like a signature"). Thus, the court erred by admitting evidence of these prior bad acts for the purpose of proving Appellant's identity as the person who stabbed Mr. Worthy.

Next, we must assess whether the prior bad acts evidence was admissible to prove Appellant's intent. The Commonwealth argues that because Appellant was charged with first-degree murder, which requires proof of intent to kill, the court properly admitted the prior bad acts evidence because "[t]he Bowling and Cabiness stabbings prove that [Appellant] did not accidentally stab the victim in the heart, but that he could, where he desired, intentionally plunge a short knife into the victim's heart or refrain from doing so. The evidence therefore made it far more likely that he intended to kill the victim when he stabbed him in the heart, and far less likely that it was an unintended result." Commonwealth's Brief at 37.

Appellant, however, contends that the prior bad acts evidence was irrelevant to prove intent because: (1) he did not assert a defense of accident, mistake, or lack of intent; and (2) the requisite intent to kill was demonstrated by the fact that a deadly weapon was used on a vital part of the victim's body. In support of his argument, Appellant relies on **Ross**, where we rejected a similar argument as that made by the Commonwealth herein. Specifically, the Commonwealth in **Ross** contended "that because

Ross was charged with first-degree murder, which requires intentional conduct, that his state of mind was at issue." *Id.* at 101. This Court disagreed "that intent was at issue" in *Ross*, explaining:

Intent is a mental state that can be inferred from conduct. ***Commonwealth v. Martinez***, 301 Pa. Super. 121, 447 A.2d 272, 274 (1982). Given the circumstances surrounding Miller's murder, including the mutilation of the body, the use of duct tape, and the bite mark on her breast, there can be no question that this was an intentional killing. Ross' only defense was that he was not the perpetrator, and he did not raise any defense of accident, mistake, or lack of required intent. Accordingly, prior bad acts testimony should not have been permitted with regard to intent.

*Id.* at 101 (footnote omitted).

Here, as in *Ross*, Appellant claimed that he was not the person who stabbed Mr. Worthy; he did not aver that he stabbed Mr. Worthy accidentally or without the intent to kill. Indeed, such an argument would have been futile considering that Mr. Worthy was clearly stabbed with a deadly weapon (a knife) in a vital part of his body (the heart), thereby allowing the jury to infer that his attacker had the intent to kill. *See Commonwealth v. Packard*, 767 A.2d 1068, 1071 (Pa. Super. 2001) (stating "specific intent [to kill] may reasonably be inferred from an accused's use of a deadly weapon on a vital part of the victim's body") (citation omitted).[3] Therefore,

_____

[3] In any event, even if the prior bad acts evidence was admissible to prove intent, we would conclude that the prejudicial impact of that evidence outweighed the minimal probative value it held, considering that it was cumulative evidence of Appellant's intent to kill.

as we concluded in **Ross**, Appellant's intent was not at issue in the present case. Consequently, the court erred by admitting evidence of Appellant's prior bad acts to demonstrate his intent to kill.

In sum, we conclude that the trial court abused its discretion when it determined that the prior bad acts evidence was admissible to prove Appellant's identity and/or intent. While we typically would go on to assess whether the admission of this evidence was harmless error, the Commonwealth does not meaningfully develop any argument in that regard, presumably because the circumstantial evidence against Appellant was not exceptionally strong. Accordingly, the Commonwealth has failed to demonstrate that a new trial is not warranted. **See Commonwealth v. Brooker**, 103 A.3d 325, 332 (Pa. Super. 2014) (stating it is the Commonwealth's burden to establish that the error was harmless beyond a reasonable doubt). Therefore, we reverse Appellant's judgment of sentence and remand for a new trial, where the prior bad acts evidence shall not be admitted against Appellant.

Judgment of sentence reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>4/13/2016</u>